## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CHAD OLCOTT,<br><br>          Plaintiff,<br><br>     v.<br><br>WIN WASTE INNOVATIONS,<br><br>          Defendant. | Case No. 23–cv–21551–ESK–SAK<br><br><br>OPINION |

**KIEL, U.S.D.J.**

Defendant Win Waste Innovations (WWI) fired plaintiff Chad Olcott because he failed to comply with safety rules and policies. There are no material factual disputes. Olcott concedes that the record supports WWI's finding that he committed a high risk violation by entering a confined space without a hole watch. He fails to point to any evidence that he was fired because of his injury or retaliated against for requesting accommodations and filing a workers' compensation claim. Summary judgment in favor of WWI will be entered.

## I.  FACTUAL BACKGROUND[1]

Olcott was hired by WWI in July 2021 as a Class I Mechanic at its Westville, New Jersey waste-to-energy facility.   (ECF No. 53–4 (Saenz Decl.)[2] ¶¶1, 2; ECF No. 53–6 (Olcott Dep. Tr.) p.11.[3])   As a Class I Mechanic, Olcott performed maintenance and repair work on industrial equipment and reported directly to maintenance manager Paul Curcio.   (Saenz Decl. ¶4; Olcott Dep. Tr. p.11; ECF No. 53–5 (Saenz Dep. Tr) p.10.)   Ludwig Saenz was the plant manager.   (Saenz Dep. Tr. p.6.)

WWI maintains safety policies and protocols.   (ECF No. 53–7 (Jones Dep. Tr.) pp.78, 79.)   Employees are required to wear personal protective equipment

---

[1] WWI submitted a statement of material facts, to which Olcott filed a responsive statement.   While these statements of facts cite to the record, the fact section of the parties' briefs do not.   This increased the Court's burden.   *See Globespanvirata v. Texas Instrument,* No. 03–2854, 2005 WL 3077915, at \*2 (D.N.J. Nov.15, 2005) (noting that the purpose of a statement of material fact is to "clarify the issues for the Court, not to increase the burden before it").   Also, Olcott's legal argument has facts that are not in his responsive statement of material facts or fact section of his opposition brief.

[2] Olcott states he "is unable to concede or dispute" facts asserted in Saenz's declaration because it is an "unsworn declaration."   (*See generally* 54–1.)   Local Civil Rule 56.1(a) requires a responsive statement of material facts responding to each paragraph of the movant's statement, "and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion."   "[A]ny statement, or portion thereof, that is not clearly denied—in *substance*, not merely with the label 'disputed'—and with a proper citation to the record in a responsive [Local Civil] Rule 56.1 statement is deemed admitted." *Juster Acquisition Co. LLC v. N. Hudson Sewerage Auth.*, No. 12–03427, 2014 WL 268652, at \*1 n.1 (D.N.J. Jan. 23, 2014); *see also* Fed. R. Civ. P. 56(e) (providing that, if a party fails to properly address an assertion of fact, a court may provide the party an opportunity to properly address the fact, consider the fact undisputed, grant summary judgment, or issue any other appropriate order).   The Saenz declaration has the correct jurat, *see* 28 U.S.C. §1746, and Olcott failed to substantively dispute the facts in Saenz's declaration.   Thus, the facts in Saenz's declaration are deemed admitted.

[3] Citations to pages of deposition transcripts are to the ECF page numbers, not to the page numbers of the transcripts.

(PPE), such as earplugs. (*Id.* pp. 80, 81.) Pursuant to its Confined Space Policy, WWI also requires all employees to obtain an entry permit before entering a confined space. (*Id.* pp. 79, 80.) The permit provides that a designated hole watch supervise and sign employees in and out each time they enter and exit a confined space. (*Id.*) A violation of the Confined Space Policy permits WWI to terminate an employee on the first offense. (*Id.*)

Olcott violated both policies. On July 7, 2022, WWI's safety manager observed Olcott working without earplugs. (*Id.* p. 71; Olcott Dep. Tr. pp. 13–15; ECF No. 59 p. 54 (July 2022 Progressive Discipline Form).) Olcott testified that his earplugs were in his pocket, but he chose not to wear them because of a medical condition. (Olcott Dep. Tr. pp. 13, 14.) Olcott never sought an accommodation for this condition, but "absolutely 100 percent agree[s] that [he] should [have] be[en] written up for" this incident. (*Id.*) Olcott inserted his earplugs at the safety manager's instruction but was "written up" for the same violation on July 16, 2022. (*Id.* pp. 13, 14; Saenz Dep. Tr. p. 45; July 2022 Progressive Discipline Form.) Olcott claims that the second incident was accidental because his right earplug fell out when he was exiting a confined space. (Olcott Dep. Tr. pp. 13, 14.) Olcott was observed violating the PPE policy on multiple occasions beyond these two incidents. (Saenz Dep. Tr. p. 45.) On July 17, 2022, Olcott received a written warning for his repeated failure to wear earplugs. (July 2022 Progressive Discipline Form.) The written warning indicates that Olcott's failure to remediate his behavior would result in further discipline, including termination. (*Id.*) After receiving the written warning, Olcott complied with the PPE policy. (Saenz Dep. Tr. p. 45.)

On September 23, 2022, Saenz initiated an investigation into an incident in which Olcott allegedly sustained a shoulder injury. (*Id.* p. 25; Olcott Dep. Tr. p. 17.) On that day, Olcott and Christoper Liwock, were assigned to repair the incline and tail of a conveyor. (Olcott Dep. Tr. p. 18.) Joseph Wall was

3

assigned as the designated hole watch  (*Id.* p.25; ECF No. 53–10 (Wall Dep. Tr.) pp.9, 10.)  Although Liwock observed Olcott to be physically okay, Olcott indicated to Liwock and Curcio at the end of this shift that his shoulder was "starting to bother [him] quite significantly."  (Liwock Dep. Tr. p.12; Olcott Dep. Tr. pp.27, 28.)  After speaking with Saenz about his injury, Saenz sent Olcott home to rest his shoulder.  (Olcott Dep. Tr. p.28.)  Although Saenz did not say he doubted Olcott's injury claim, Olcott alleges that he could infer from Saenz's attitude that Saenz did not believe him.  (*Id.* p.58.)

When Olcott returned to work on September 26, 2022, he was referred to a workers' compensation physician, who ordered Olcott to get an MRI.  (Olcott Dep. Tr. pp.32, 33.)  Saenz testified that he instructed Olcott that rather than "do things on his own," he should work with WWI's safety manager and company nurse to coordinate his medical care. (Saenz Dep. Tr. p.38.) Consistent with the physician's examination, Saenz approved Olcott's request for light duty through September 30, 2022.  (*Id.* p.34; Olcott Dep. Tr. pp.26, 39, 6.)  Olcott was allowed to remain on the clock while attending his MRI appointment, and Curcio approved his request to clock out for the remainder of the day.  (Olcott Dep. Tr. pp.36, 59.)

On September 29, 2022, Olcott was prescribed physical therapy and provided Saenz with his paperwork.  (*Id.* pp.37, 38.)  Olcott's intention was to start physical therapy immediately so he could return to work as fast as possible but Saenz told him that he would have to wait "until corporate approves it." (*Id.* pp.37–39.)  That same day, Saenz spoke with Wall and Liwcok about the repair of the conveyor's tail to understand how Olcott was injured.  (Saenz Dep. Tr. pp.29, 50, 51.)  Saenz learned that Liwock and Wall were not "really present at the time of incident" and Wall was not hole watching.  (*Id.* p.29.) When Olcott had entered the confined space at the conveyor's tail, Liwock and Wall were on the ground, off of the conveyor.  (Olcott Dep. Tr. pp.20, 21.)

4

Liwock and Wall told Saenz that they became aware that Olcott entered the confined space only after Olcott exited the space and announced that he repositioned the chain at the conveyor's tail.   (Saenz Dep. Tr. pp. 29, 30; Wall Dep. Tr. p. 9.)   Wall provided Saenz with a written statement that same day and Liwock provided his on October 4, 2022.[4]   (Saenz Dep. Tr. pp. 29, 30; Wall Dep. Tr. p. 9; ECF No. 59 p. 4 (Wall Statement); Liwock Dep. Tr. p. 41; ECF No. 59 p. 6 (Liwock Statement).)   Their written statements  were consistent with what they had told Saenz.   (Saenz Dep. Tr. pp. 29, 30; Wall Dep. Tr. p. 9; Wall Statement; Liwock Statement.)   Saenz submitted the written statements to human resources.   (Saenz Dep. Tr. p. 29.)

Based on these discussions and nobody telling him otherwise, Saenz determined that Olcott violated the Confined Space Policy.   (Saenz Dep. Tr. pp. 30, 40.)   Given this high-risk offense and Olcott's prior disciplinary history, Saenz recommended to human resources that Olcott be terminated.   (*Id.* p. 40.)   Human resources accepted Saenz's recommendation and Olcott was fired on September 30, 2022.   (*Id.*; ECF No. 59 p. 2 (September 2022 Progressive Discipline Form).)   Thereafter, Olcott used his workers' compensation benefits to attend physical therapy.   (Olcott Dep. Tr. pp. 38 51.)

Olcott concedes that Wall and Liwock's statements support Saenz's conclusion that he entered a confined space without a hole watch.   (Olcott Dep. Tr. pp. 21, 31; Saenz Dep. Tr. p. 44.)   But Olcott asserts that he did in fact tell Wall before entering the confined space at the conveyor's tail, and that Wall affirmatively permitted him to enter the space.   (Olcott Dep. Tr. pp. 21, 31.)

---

[4] Liwock submitted his written statement after Olcott's termination, but Saenz explained that "[t]he written statements were to confirm and put everything on paper that this is really, in fact, what took place."   (Saenz Dep. Tr. pp. 30, 31.)   Saenz had enough information without Liwock's written statement to determine that Olcott violated the Confined Space Policy.   (*Id.*)

5

Olcott, thus, believes that WWI used his shoulder injury as a pretext to terminate him.   (*See generally* ECF No. 1–1 (Compl.) ¶¶ 26–30.)

Wall maintains that Olcott failed to comply with the Confined Space Policy (*see* Wall Dep. Tr. pp. 9, 13), but Liwock testified at his deposition that he lied to Saenz (Liwock Dep. Tr. pp. 9–11).   Contrary to his verbal and written statements, Liwock testified that he remembers Olcott calling out to Wall and "pointing and using the physical arm and finger motion to tell [them] … [he's] going in."   (*Id.* p. 11.)   Wall acknowledged Olcott and gave him affirmative permission to enter the confined space.   (*Id.*)   Liwock explained that he can now tell the truth because he no longer works for WWI and does not fear that telling the truth will put his livelihood in jeopardy.   (*Id.* pp. 41, 42.)[5]

## II.  PROCEDURAL HISTORY

Olcott commenced this New Jersey Law Against Discrimination (NJLAD) action in the Superior Court of New Jersey on September 13, 2023.   (*See generally* Compl.)   Olcott's six-count complaint raises claims against WWI for disability discrimination, failure to accommodate, and retaliation.   (*Id.* pp. 6–10.)   Olcott also seeks equitable relief[6] and common law relief pursuant to *Pierce v. Ortho Pharmaceutical Corp.,* 417 A.2d 505 (N.J. 1980) for workers'

---

[5] No testimony was elicited at Liwock's deposition about whether he told Saenz that he had lied.   Liwock testified that his only statement to Saenz about this incident was untrue and that he feared retaliation.   It can therefore be reasonably inferred that Liwock did not tell Saenz the truth, and Saenz had only Wall's statement and Liwock's allegedly untruthful statement to rely on when recommending that Olcott be fired.   (*See* Liwock Dep. Tr. p. 41.)

[6] A prayer for equitable relief is not an independent claim.   Since such relief falls within the other claims, I will not address Olcott's request for equitable relief separately.   *See Riconda v. US Foods, Inc.*, No. 19–01111, 2019 WL 4254389, at *1 (D.N.J. Sept. 9, 2019).

compensation retaliation.   (*Id.* pp. 8–10.)   On October 27, 2023, WWI removed this action to this Court.   (ECF No. 1.)   The parties proceeded with discovery, and pursuant to the Court's briefing schedule, WWI moved for summary judgment on March 14, 2025.   (ECF Nos. 44, 46.)   I ordered the parties to mediation, pending which the March 2025 motion for summary judgment was administratively terminated.   (ECF No. 48.)   Mediation was unsuccessful. (ECF No. 49).   WWI filed the Motion on June 25, 2025.   (ECF Nos. 53, 53–1 (Mov. Br.).)   Olcott filed an opposition to the Motion (ECF No. 54–2 (Opp'n Br.)), in response to which WWI filed a reply (ECF No. 61.)   In further support of his opposition, Olcott filed a letter objecting to the reply (ECF No. 62), to which WWI filed a response (ECF No. 63).   I directed the parties to refrain from filing further submissions relating to the Motion.   (ECF No. 64.)

### III. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A fact is material if it will "affect the outcome of the suit under the governing law."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a "reasonable jury could return a verdict for the nonmoving party."   *Id.*   The movant "bears the burden of demonstrating the absence of any genuine issues of material fact."   *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996).   The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   Instead, the nonmovant must "point to

7

concrete evidence in the record that supports each and every essential element of his case."   *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995).

The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial.   *Anderson*, 477 U.S. at 249.   In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party," and credibility determinations are for the fact finder.   *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. DISCUSSION

### A.   <u>NJLAD</u>

"The NJLAD prohibits 'any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment.'" *Rich v. State*, 294 F. Supp. 3d 266, 278 (D.N.J. 2018) (quoting N.J.S.A. §10:5–4.1)).   "The NJLAD is a remedial statute 'deserving of a liberal construction,' and the statutory definition a disability is very broad in scope."   *Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 236 (D.N.J. 2015) (quoting *Clowes v. Terminix Intern., Inc.,* 538 A.2d 794, 802 (N.J. 1988)).   "New Jersey courts interpreting the statute have repeatedly emphasized that the NJLAD's definition of 'disability' is not restricted to 'severe' or 'immutable' disabilities." *Id.*   Thus, "conditions that are 'demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques' have been accepted as disabilities under the [NJ]LAD."   *Id.* (quoting *Olson v. Gen. Elec. Astrospace,* 966 F. Supp. 312, 315 (D.N.J.1997)).

While "[t]he elements of an NJLAD claim vary based on the cause of action alleged," NJLAD claims are subject to the *McDonnell Douglas Corp. v. Green,*

411 U.S. 792 (1973) burden-shifting framework.    *Rich*, 294 F. Supp. at 278–79. "Under *McDonnell Douglas,* the plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination."    *Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 937 (3d Cir. 2009).    "If the plaintiff succeeds, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's action."    *Id.*    "Once the employer meets its relatively light burden, the burden of production returns to the plaintiff, who must show by a preponderance of the evidence that the employer's proffered reason is pretextual."    *Id.*    To demonstrate pretext, the plaintiff:

> generally must submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir.1994)).

### 1.    Disability Discrimination

"[T]to establish a *prima facie* case of disability discrimination under the NJLAD," Olcott must demonstrate that he (1) "was handicapped or disabled within the meaning of the statute"; (2) "was qualified to perform the essential functions of the position of employment, with or without accommodation"; (3) "suffered an adverse employment action because of the handicap or disability"; and (4) was replaced by "another to perform the same work after plaintiff had been removed from the position."    *Rich*, 294 F. Supp. 3d at 278 (quoting *Victor v. State*, 952 A.2d 493, 501 (N.J. Sup. Ct. App. Div. 2008), *aff'd as modified*, 4 A.3d 126 (N.J. 2010)).    Here, only the fourth element is disputed.[7]

---

[7] WWI states a different standard for a *prima facie* showing of disability discrimination under the NJLAD.  (Mov. Br. p.22.)   While the first three elements are the same and are not in dispute, WWI indicates as to the fourth element that Olcott must establish that the adverse employment action he suffered gives rise to an

Olcott recognizes that he must demonstrate that after his termination, WWI sought or hired a similarly qualified person to perform his role.   (Opp'n Br. pp. 6, 7.)   Olcott's failure to make such a showing justifies granting the Motion as to this count.   *See Haines*, 2023 WL 5623363, at \*6 (granting the defendant's motion for summary judgment as to the plaintiff's NJLAD disability discrimination claim because the plaintiff failed to establish that the defendant "sought a similarly qualified individual to replace [him] after his termination").   The Complaint is devoid of any such allegation, and the record makes no mention of whether Olcott's job responsibilities were subsumed by other employees or a replacement was hired.

Instead of addressing the fourth element, Olcott jumps to the conclusion that his termination was pretextual.   (*See* Opp'n Br. pp. 8–14.)   He suggests that because the first two elements of the *prima facie* standard are satisfied, the burden shifts to WWI under *McDonnel Douglas* to provide a non-discriminatory reason for his termination.   (*Id.*)   The *McDonnell Douglas*

---

inference of discrimination.   (*Id.* pp. 22, 23 (first citing *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 848 (3d Cir. 2016)).   Consistent with the standard provided here, *Tourtellotte*, like the majority of courts within this district, apply the standard set forth by the New Jersey Supreme Court in *Victor*.   *See Tourtellotte*, 636 F. App'x at 848 (stating that the fourth element of a *prima facie* case of disability discrimination requires the plaintiff to demonstrate that his or her employer sought and/or filled that position with a similarly-qualified person); *see also Haines v. Takeda Pharms. USA, Inc.*, No. 20–04336, 2023 WL 5623363, at \*6 (D.N.J. Aug. 31, 2023) (noting that prior to *Victor*, the New Jersey Superior Court Appellate Division had held that "the appropriate fourth element of a plaintiff's *prima facie* case [for NJLAD discrimination] require[d] a showing that the challenged employment decision … [gave] rise to an inference of unlawful discrimination" (quoting *Williams v. Pemberton Twp. Pub. Schs.*, 733 A.2d 571, 578 (N.J. Super. Ct. App. Div. 1999))).   Although courts may apply the inference of discrimination element in limited situations, *see Fitzgerald v. Glenn Ins., Inc.*, No. 20–14891, 2023 WL 2728818, at \*9 (D.N.J. Mar. 31, 2023), I find that the appropriate standard to apply to a discriminatory discharge claim is set forth in *Victor* and noted above.

10

framework cannot proceed until all four elements of the *prima facie* case are satisfied.   *Tourtellotte*, 636 F. App'x at 848.

Even if Olcott could make a *prima facie* showing, the claim would still fail because WWI offers a legitimate nondiscriminatory reason for terminating Olcott.   (*See* September 2022 Progressive Discipline Form.)   A violation of the Confined Space Policy is grounds for termination.   (Jones Dep. Tr. pp. 79, 80.) The undisputed facts establish that WWI and Saenz believed Olcott entered a confined space without a hole watch.   (Saenz Dep. Tr. pp. 29, 30; Wall Dep. Tr. p. 9; Liwock Statement; Wall Statement.)   While Olcott points to evidence suggesting that his termination was based on false information (Liwock Dep. Tr. pp. 9–11), "it does not matter whether an employer was mistaken about what an employee did to justify his termination."   *Haines*, 2023 WL 5623363, at *6 n.7; *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (holding that "to discredit the employer's proffered reason ... [a] plaintiff cannot simply show that the employer's decision was wrong or even mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent"); *Kwiatkowski v. Merrill Lynch*, 2008 WL 3875417, at *8 (N.J. Super. Ct. App. Div. 2008) (applying the rule in *Fuentes* to NJLAD discrimination claim).   There is no evidence that Saenz knew Liwock had lied to him.   (Liwock Dep. Tr. pp. 9–11.)   Saenz's recommendation to human resources to fire Olcott was based on the statements Wall and Liwock provided to him at the time of the incident.   (Saenz Dep. Tr. pp. 29, 30, 40.)   Since there is no evidence in the record showing that WWI did not have an honest belief that he violated the Confined Space Policy, Olcott cannot meet his burden of showing pretext.

### 2.   Failure to Accommodate

To prevail on a failure to accommodate claim, a plaintiff must first satisfy the *prima facie* elements of a disability discrimination claim.   *Tourtellotte*, 636

11

F. App'x at 849.   The plaintiff must then establish the following elements "to show that an employer failed to participate in the interactive process:" (1) the employer knew of the plaintiff's disability; (2) the plaintiff requested disability accommodations or assistance; (3) the employer made no good faith effort to assist; and (4) that plaintiff "could have been reasonably accommodated but for the employer's lack of good faith."   *Id.* (quoting *Victor*, 4 A.3d at 145).   "Once a request for accommodation is made, both parties have a duty to assist in the search for an appropriate reasonable accommodation."   *Id.*   But "New Jersey law places the duty on the employee to initiate a request for an accommodation." *Fitzgerald*, 92 F. Supp. 3d at 238.   "Although there is no specific formula and the request need not formally invoke the magic words 'reasonable accommodation,' the plaintiff must 'nonetheless make clear that the employee wants assistance for his or her disability.'"   *Id.* (quoting *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 313 (3d Cir.1999)); *Linton v. L'Oreal USA,* 2009 WL 838766 (D.N.J. Mar. 27, 2009) ("Something more is required of an employee ... than merely apprising her employer that she is still injured to start the interactive process for seeking an accommodation; the employee must arguably seek assistance to survive summary judgment.").

Olcott concedes that WWI initially provided reasonable accommodations by assigning him to light duty work.   (Opp'n Br. p. 21.)   Yet, he takes issues with WWI not following the "problem-solving approach" required in 29 C.F.R. § 1630.9 and having effectively rescinded his accommodation by firing him. (*Id.* pp. 21, 22.)   Considering Olcott failed to make a *prima facie* showing of his disability discrimination claim, *see supra* pp. 9–11, Olcott's failure to accommodate claim also fails.   *See Tourtellotte*, 636 F. App'x at 849.

### 3.   Retaliation

Olcott argues that WWI fired him because he asked for a reasonable accommodation and/or sought workers' compensation benefits.   "Retaliation

12

claims under the NJLAD require the plaintiff to "demonstrate by a preponderance of the evidence that" (1) the plaintiff "engaged in protected activity—here, a request for a reasonable accommodation"; (2) the plaintiff "suffered an adverse action"; and (3) "a causal connection exists between the protected activity and the adverse action." *Fitzgerald*, 92 F. Supp. 3d at 239.

Olcott presents only conjecture and no evidence to establish a causal connection between his termination and his seeking of accommodations or workers' compensation benefits. Although Olcott was fired shortly after injuring himself, there is no dispute that Olcott was fired because of his disciplinary history and failure to comply with WWI's Confined Space Policy. *See supra* pp.9–11.

### B.    Workers' Compensation Retaliation

Pursuant to *Pierce v. Ortho Pharmaceutical Corp.*, "New Jersey recognizes a common law claim for retaliatory discharge when an employee is discharged contrary to a clear mandate of public policy." *Morris v. Siemens Components, Inc.*, 928 F. Supp. 486, 492 (D.N.J. 1996). "[T]he discharge of an employee in retaliation for filing a workers' compensation claim has been found to fall within a '*Pierce*-type' claim." *Id.* "[T]o establish a *prima facie* case for retaliatory discharge, the employee must prove that: (1) he or she attempted to make a claim for workers' compensation benefits; and (2) he or she was discharged for making that claim" *Id.* If both elements are satisfied, the burden shifts to the defendant under the *McDonnell Douglas* framework "to articulate a legitimate, non-discriminatory reason for the discharge." *Id.* "Ultimately, the plaintiff must show that the defendant's proffered reasons for the discharge are not worthy of belief and that the defendant acted with the intent to retaliate unlawfully." *Id.* A defendant is entitled to summary judgment on such a claim if the defendant "can demonstrate that: (1) the plaintiff is unable to establish a *prima facie* case of retaliatory discharge; or (2) if plaintiff can

13

establish a *prima facie* case, the plaintiff cannot produce sufficient evidence of pretext to rebut the defendant's asserted legitimate reason for discharge."   *Id.* This claim, which largely mirrors Olcott's NJLAD retaliation claim, fails for the same reasons as Olcott's other claims.

## V.  CONCLUSION

For the reasons stated above, the Motion is **GRANTED.**

        */s/ Edward S. Kiel*
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated: March 11, 2026

14